J-S71006-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| IAN HYATT | : | |
| | : | |
| Appellant | : | No. 2665 EDA 2018 |

Appeal from the Judgment of Sentence Entered August 23, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0002152-2017

BEFORE:  BOWES, J., MURRAY, J., and McLAUGHLIN, J.

MEMORANDUM BY BOWES, J.:                          Filed: April 30, 2020

Ian Hyatt appeals from his judgment of sentence of six to twelve years of imprisonment, imposed after he was convicted of rape of an unconscious person and related charges.  After thorough review, we affirm.

The trial court summarized the factual history of this case as follows:

On February 21, 2017, [Victim] had dinner and two or three cocktails with a friend.  She returned home to 822 North Preston Street in West Philadelphia, where she had been living with [Appellant] and three other house mates in a rooming house for two or three weeks.  She went to her room to change into pajamas and take her prescribed insomnia medication, and then agreed to watch a movie with [Appellant] in their communal living room. She fell asleep on the living room couch soon after the movie began, briefly waking up once when a pizza arrived.

Sometime later, [Victim] woke up on her living room couch to find that her pants and underwear were pulled down to the middle of her thighs, and [Appellant] was positioned behind her, penetrating her vagina with his penis. [Victim] . . . . testified that she was unconscious when [Appellant] began to engage in sexual intercourse with her, and that she did not consent to sexual

intercourse or any other sexual activity with [Appellant] at any time that evening. She immediately said two things to [Appellant], in some order: "What the fuck," and "Are you wearing a condom?"

She jumped from the couch, ran upstairs, and searched Google for "what to do if you get raped." Based on her research, she contacted Women Organized Against Rape (hereinafter WOAR) and took an Uber to the Hospital of the University of Pennsylvania. There, she met with a WOAR representative and gave a urine sample, and a police officer arrived to transport her to the Special Victims Unit, where she received a rape examination. [Appellant] was arrested a few hours later.

Trial Court Opinion, 3/5/19, at 2-3 (footnotes and citations omitted).

Appellant was charged with rape of an unconscious person, sexual assault, indecent assault of an unconscious person and unlawful restraint. Prior to trial, the Commonwealth served notice of its intention to present evidence that Appellant had previously assaulted another woman, S.H. in a similar fashion. Specifically, the Commonwealth sought to introduce evidence that, on April 30, 2016, S.H. told police that she was inside Appellant's bedroom with Appellant. They smoked marijuana together, but earlier she had consumed beer and taken two Tylenol P.M tablets. She fell asleep, and, sometime thereafter, awoke to Appellant engaging in vaginal intercourse with her without her consent. Appellant had made sexual advances prior to the assault and S.H. had explicitly rejected him. Although charges were filed, they were withdrawn after S.H. failed to appear.

Appellant filed a response to the Commonwealth's motion and, following a hearing, the trial court granted the Commonwealth's motion.[1] Appellant proceeded to trial at which both, S.H. and Victim testified for the Commonwealth. Appellant called two character witnesses and testified in his own defense, claiming that Victim was fully conscious and consented to having sexual intercourse with him. The jury found Appellant guilty on all counts, and on August 23, 2018, the trial court sentenced Appellant to six to twelve years of incarceration.

Appellant filed a timely post-sentence motion challenging the admittance of S.H.'s testimony, the sufficiency and weight of the evidence, and the discretionary aspects of his sentence. The trial court denied the motion without a hearing and this appeal followed. Both Appellant and the trial court complied with the mandates of Pa.R.A.P. 1925.

Appellant raises the following issues for our review:

1.    Whether the trial court erred in granting the Commonwealth of Pennsylvania's [m]otion to [a]dmit a prior bad act involving Appellant and another individual named S.H.

2.    Whether there was sufficient evidence presented warranting the verdict of guilty on the charge of rape of an unconscious person, sexual assault[,] and indecent assault of a person unconscious.

---

[1] The Commonwealth filed a second motion *in limine* seeking to admit evidence as consciousness of guilt that, after arrest, Appellant assaulted multiple police officers and repeatedly told them to "kill me." **See** Commonwealth's Notice of Intent, 6/6/18, at 1. Appellant filed a response and the trial court denied the motion without a hearing.

3.  Whether the jury's verdict of guilty on the charges of rape of an unconscious person, sexual assault[,] and indecent assault of a person unconscious was against the weight of the evidence.

4.  Whether the trial court abused its discretion in sentencing Appellant to six to twelve years of incarceration which was an aggravated sentence and beyond the top of the standard guideline range of sixty-six months.

Appellant's brief at 7.

In his first claim, Appellant argues that the trial court erred when it admitted S.H.'s testimony about a prior sexual assault perpetrated by Appellant. *Id*. at 16. We consider Appellant's challenge to the admission of the testimony mindful of our standard of review:

> The admissibility of evidence is a matter addressed to the sound discretion of the trial court and . . . . an appellate court may only reverse upon a showing that the trial court abused its discretion. As abuse of discretion is not a mere error in judgment but, rather, involves bias, ill will, partiality, prejudice, manifest unreasonableness, or misapplication of law.

*Commonwealth v. Cox*, 115 A.3d 333, 336 (Pa.Super. 2015) (internal citations and quotation marks omitted). Additionally, we note that we may affirm the trial court's ruling on any basis supported by the record. *See Commonwealth v. Johnson*, 160 A.3d 127, 144 (Pa. 2017).

Appellant attacks the admission of S.H.'s testimony as improper propensity evidence that does not meet the common plan exception to Pa.R.E. 404(b). *See* Appellant's brief at 16-28. Further, he alleges that its prejudicial impact far outweighed any probative evidentiary value. *Id*. at 29-32

Under Rule 404(b):

- 4 -

(1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.

(2) Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

(3) Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs its potential for prejudice.

Pa.R.E. 404(b).

By introducing the testimony into evidence, the Commonwealth revealed Appellant's prior arrest, and the reasons for it, to the jury. When reviewed in light of Pa.R.E. 404(b), this evidence constituted evidence of another crime committed by Appellant. However, the Commonwealth contends that the evidence was properly admitted as it falls within the common plan, scheme or design exception. *See* Commonwealth's brief at 6-12; *see also* Pa.R.E. 404(b)(2). We agree.

A determination of admissibility under the common plan exception

must be made on a case by case basis in accordance with the unique facts and circumstances of each case. However, we recognize that in each case, the trial court is bound to follow the same controlling, albeit general, principles of law. When ruling upon the admissibility of evidence under the common plan exception, the trial court must first examine the details and surrounding circumstances of each criminal incident to assure that the evidence reveals criminal conduct which is distinctive and so nearly identical as to become the signature of the same perpetrator. Relevant to such a finding will be the habits or patterns of action or conduct undertaken by the perpetrator to commit crime, as well as the time, place, and types of victims

- 5 -

typically chosen by the perpetrator. Given this initial determination, the court is bound to engage in a careful balancing test to assure that the common plan evidence is not too remote in time to be probative. If the evidence reveals that the details of each criminal incident are nearly identical, the fact that the incidents are separated by a lapse of time will not likely prevent the offer of the evidence unless the time lapse is excessive.

*Commonwealth v. Cosby*, 224 A.3d 372, 398 (Pa.Super. 2019) (quoting

*Commonwealth v. Frank*, 577 A.2d 609, 614 (Pa.Super. 1990)).

Importantly, this Court has also permitted prior bad act evidence under the common plan exception "to counter [an] anticipated defense of consent."

*Commonwealth v. Tyson*, 119 A.3d 353, 361 (Pa.Super. 2015) (*en banc*).

In *Tyson*, the defendant was accused of rape and related offenses after he allegedly engaged in sex with an unconscious acquaintance. The victim had invited the defendant over to bring her soup because she was not feeling well. Sometime after the defendant arrived, the victim fell asleep. She awoke to find the defendant engaging in vaginal intercourse with her. She told the defendant to stop and he complied. She told the defendant she did not want to have sex with him and fell back asleep. A short time later, she again awoke to Appellant having sex with her. The defendant claimed that the victim was conscious and had consented to having sex with him both times.

In a motion *in limine*, the Commonwealth sought a ruling that it could introduce the facts underlying the defendant's prior rape conviction under the common scheme exception. The trial court denied the motion, but on appeal we reversed, noting that:

> The factual overlap between the two incidents goes beyond the commission of crimes or conduct "of the same general class." The evidence does not merely show [the defendant] sexually assaulted two different women or that [his] actions are generically common to many sexual assault cases. To the contrary, the incidents reflect a clear pattern where [the defendant] was legitimately in each victim's home; [he] was cognizant of each victim's compromised state; and [he] had vaginal intercourse with each victim in her bedroom in the middle of the night while the victim was unconscious.

*Id*. at 360. We also determined that the five-year lapse in time between the rapes did not undermine the prior act's probative value, because the defendant was incarcerated for a majority of that time and because the "similarities [between] the two incidents render[ed] the five-year time gap even less important." *Id*. at 361.

Additionally, we held that the prior incident could be used to defeat an anticipated defense of consent in a case of sexual misconduct under the absence-of-mistake exception, reasoning that:

> [the defendant] disputes [the victim's] account that she was asleep when [he] initiated sexual intercourse with her—[the defendant] maintains he thought [the victim] consented to the act. Given the relevant similarities between the two incidents, evidence of [the defendant's] prior rape would tend to prove he did not "mistakenly believe" [the victim] was awake or gave her consent. [The defendant] was invited into [the victim's] home for another reason, [he] knew [the victim] was in a compromised state, and [the victim] awoke to find [him] having vaginal intercourse with her. [The defendant's] prior conviction would likewise show he had been invited into the home of an acquaintance, knew the victim was in a compromised state, and had non-consensual sex with the victim while the victim was unconscious. The prior conviction would tend to prove [the defendant] was previously in a very similar situation and suffered legal consequences from his decision to have what proved to be non[-]consensual vaginal intercourse with an unconscious victim.

> Thus, the evidence would tend to show [the defendant] recognized or should have recognized that, as with [the prior woman raped by the defendant], [the victim's] physical condition rendered her unable to consent.

*Id*. at 362–63.

Here, the trial court relied heavily on the *Tyson* holding, declaring that it was "directly on point," and "binding authority." N.T. Motions Hearing, 1/26/18, at 12. We agree. As in *Tyson*, the factual similarities between the two crimes here went beyond "the commission of crimes or conduct of the same general class." *Tyson*, *supra* at 357. As the trial court explained, both crimes involved women in their twenties who were casual acquaintances of Appellant. N.T. Motions Hearing, 1/26/18, at 12-13. Additionally, they spent the night in a house where Appellant was present, took intoxicating substances before the assaults, were unconscious at the time of the assaults, and reported waking up with Appellant's penis inside of their vaginas. *Id*. The ten-month time lapse between the two crimes was much shorter than the one present in *Tyson*. Finally, the defense position was that the victim was awake and the sex was consensual. *Id*. at 7. Accordingly, as in *Tyson*, the absence-of-mistake exception was an alternative avenue to admissibility.

Moreover, Appellant has failed to persuade us that the probative value was outweighed by the testimony's prejudicial impact. The Commonwealth limited its usage of the evidence to permissible grounds: to show a common plan, scheme or design. Further, the trial court provided a cautionary instruction. *See* N.T. Jury Trial, 6/13/18, at 172-73. *See also*

- 8 -

***Commonwealth v. Jones***, 683 A.2d 1181, 1201-02 (Pa. 1996) (finding that a clear and unambiguous instruction can prevent prejudice). Accordingly, the trial court did not err in granting the Commonwealth's motion *in limine*.

Appellant's next claim challenges the sufficiency of the evidence to support his convictions. Specifically, Appellant alleges that the Commonwealth presented insufficient evidence that Victim was unconscious and that she did not consent to having intercourse with Appellant. ***See*** Appellant's brief at 33-36. Our standard of review when considering a challenge to the sufficiency of the evidence is:

> [w]hether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Gause***, 164 A.3d 532, 540-41 (Pa.Super. 2017) (citations and quotation marks omitted).

Upon a review of the certified record, the parties' briefs, and the relevant law, the trial court's well-reasoned opinion properly delineates the elements

- 9 -

that the Commonwealth needed to prove in order to convict Appellant of each offense and describes how the evidence was sufficient to support each verdict. Accordingly, we affirm Appellant's judgment of sentence as to rape of an unconscious person, sexual assault, and indecent assault of an unconscious person on the March 5, 2019 Opinion of the Honorable Lucretia Clemons. **See** Trial Court Opinion, 3/5/19, at 14-16 (discussing Appellant's challenges to the sufficiency of the evidence, listing the elements the Commonwealth needed to prove in order to convict Appellant of each crime, and explaining that the Victim's testimony that she was unconscious and did not consent to having sex with Appellant was sufficient to establish the challenged elements).

Third, Appellant seeks a new trial on the ground that the verdict was against the weight of the evidence, *i.e.*, that the greater weight of the evidence proved that the victim was not unconscious and that she consented to having sex with Appellant. **See** Appellant's brief at 37-40.

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court: [a]ppellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

**Commonwealth v. Clay**, 64 A.3d 1049, 1055 (Pa. 2013) (citations omitted).

- 10 -

Appellant attacks the credibility of Victim's testimony that she was unconscious when Appellant began having sex with her and that she did not consent to having sex with him. **See** Appellant's brief at 37-40. Specifically, Appellant argues that his own testimony, and that of his character witnesses, was more persuasive and should have been afforded greater weight than Victim's testimony since she had ingested several medications and alcohol. **Id**. at 37. In contrast to Victim, Appellant testified that he was in an ongoing physical relationship with Victim and that she consented to and encouraged him to have sex with her that night. Appellant's character witnesses testified to his law-abiding reputation in the community.

The trial court, in denying Appellant's claim, explained that

> The jury's verdict neither surprised this [c]ourt nor disturbed its conscience: After hearing the evidence, this [c]ourt, too was persuaded beyond a reasonable doubt that [Appellant] engaged in sexual intercourse with [Victim] while she was unconscious and without her prior consent. [Victim's] trial testimony was credible and remained consistent with the information she relayed to several other Commonwealth witnesses who investigated her complaint.
>
> [Appellant's] testimony and other evidence did not cast doubt on [Victim's] testimony. [Appellant] conceded that he initiated sexual activity with [Victim] on the night in question. [Appellant] testified that he was "aggressively" sexually touching [Victim] while he was behind her on the couch, and she encouraged him to continue by "gyrating" against him and "moaning." [Appellant] claimed that [Victim] believed that she was raped only because he did not use a condom while they had consensual sex, describing her reaction after five to ten minutes of intercourse as follows:
>
>> She had turned around [during intercourse] and asked me, 'Do you have a condom on?' And that's when I

- 11 -

said no. And she then asked me, 'Did you come yet?' And I said no, not yet. And that's when she pulled me out of her and she got very upset.

She was like, 'How could you do this to me? What are you doing?'. . . . And she said, 'you know, you just like' – she kind of had to think about [it] – 'you kind of just, like, raped me.

I was like, 'what? Whoa. Hold on, hold on, hold on, hold on. [K.], I would never do that to you. You know we been chilling for this long, like, why would I even – why would I even think of doing that to you.'

Aside from its self-serving nature, [Appellant's] version of events was incredible in three key ways: First, although [Appellant] testified that [Victim] was only upset regarding his failure to use a condom and that [Victim] made no mention of her unconsciousness, he later implicitly admitted that he was aware before [Victim] went to the hospital and filed a police report that [Victim] claimed to be unconscious:

Q. Did you talk to [Victim] between the time that she went to her room and . . . . before she left?

A. She had come back downstairs and she had, you know, kept on asking me the same question.

When she turned on the light and looked at me and I looked at her directly in her eye and I said, [Victim], I would never do this to you. You know, like we've been chilling for this long, and I'm not going to sit there and forcefully – or even do this intentionally. *Like, wait until you fall asleep and then penetrate you.* Like, it doesn't make no sense.

If, as [Appellant] claimed, [Victim] was fully conscious while they engaged in consensual sex, and if she only felt that she was raped because [Appellant] failed to wear a condom, then he would have had no reason to "look her directly in her eyes" and assure her that he would "never . . . . wait [for her to] fall asleep and then penetrate [her]." Second, [Appellant's] description of his foreplay and [Victim's] fully-conscious responsiveness, if true, made it unlikely that [Victim] would fail to notice whether her consensual

sexual partner paused to put on a condom, particularly if she cared about his condom usage. Third, [Appellant's] description of a consenting partner who initially encouraged his sexual overtures and then withdrew because she eventually felt that he "kind of" raped her is at odds with the uncontroverted evidence supporting [Victim's] immediate hue and cry – she made a 2 a.m. visit to the hospital, and none of the hospital records or police paperwork corroborates [Appellant's] claim that [Victim] was upset about his condom usage rather than the fact that she was sleeping and did not consent to have sex with him.

Trial Court Opinion, 3/5/19, at 16-18 (citations omitted).

Our review of the record reveals no indication of bias or ill-will on the part of the trial court in its thorough analysis. Thus, the trial court did not abuse its discretion by denying relief on Appellant's weight claim, and Appellant's claim fails.

Finally, Appellant alleges that the trial court abused its discretion when it imposed a sentence that was six months above the standard guideline range without considering any mitigating evidence. **See** Appellant's brief at 48. This is a challenge to the discretionary aspects of Appellant's sentence, and as such, the following principles inform our consideration of whether review of this claim is warranted.

> An appellant is not entitled to the review of challenges to the discretionary aspects of a sentence as of right. Rather, an appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction. We determine whether the appellant has invoked our jurisdiction by considering the following four factors:
>
>> (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief has a fatal

- 13 -

defect; and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

***Commonwealth v. Samuel***, 102 A.3d 1001, 1006-07 (Pa.Super. 2014) (citations omitted).

Appellant filed a motion for reconsideration of his sentence and a timely notice of appeal. Appellant's brief contains a statement of reasons relied upon for his challenge to the discretionary aspects of his sentence as required by Pa.R.A.P. 2119(f). In his statement, Appellant claims that a substantial question is presented by the fact that the trial court imposed an aggravated range sentence that was manifestly excessive and failed to properly explain why it aggravated his sentence. ***See*** Appellant's brief at 14-15.[2]

We find that this claim raises a substantial question as it challenges the adequacy of the reasons given by the trial court for its sentencing choice. ***See Commonwealth v. Hyland***, 875 A.2d 1175, 1183 (Pa.Super. 2005) (concluding substantial question raised by allegation that sentencing court

---

[2] Appellant also appears to attack the trial court's alleged improper consideration of the fact that Appellant had been accused of having sex with an unconscious person before the charges in this case arose. ***See*** Appellant's brief at 15. However, Appellant did not raise this issue below. Therefore, the trial court never had the opportunity to address it and we are barred from considering it now. ***See Commonwealth v. Johnson***, 33 A.3d 122, 126 (Pa.Super. 2011) ("It is axiomatic that claims not raised in the trial court may not be raised for the first time on appeal"). Regardless, Appellant would not be entitled to relief, since the trial court considered the prior allegations in the context of Appellant's potential for rehabilitation, a factor that it was required to consider. ***See*** 42 Pa.C.S. § 9721(b).

imposed aggravated-range sentence without considering mitigating factors).

Accordingly, we now turn our attention to Appellant's challenge to his sentence.

The following principles apply to our substantive review of Appellant's claim. "When reviewing sentencing matters, this Court must accord the sentencing court great weight as it is in the best position to view the defendant's character, displays of remorse, defiance or indifference, and the overall effect and nature of the crime." *Commonwealth v. Ventura*, 975 A.2d 1128, 1134 (Pa.Super. 2009). "We cannot re-weigh the sentencing factors and impose our judgment in the place of the sentencing court." *Commonwealth v. Macias*, 968 A.2d 773, 778 (Pa.Super. 2009). Rather, we review the trial court's determination for an abuse of discretion.

> In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Antidormi*, 84 A.3d 736, 760 (Pa.Super. 2014).

A trial court's sentence "should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721(b). "When imposing sentence, a court is required to consider the particular circumstances of the offense and the character of the defendant. In considering these factors, the court should

- 15 -

refer to the defendant's prior criminal record, age, personal characteristics and potential for rehabilitation." *Antidormi*, *supra* at 761 (citations and quotation marks omitted). Finally, when the trial court has been informed by a pre-sentence report, it is presumed that the court acted reasonably. *Commonwealth v. Bullock*, 170 A.3d 1109, 1126 (Pa.Super. 2017).

Pursuant to 42 Pa.C.S. § 9781(c), we can vacate and remand only if we find (1) that the court intended to sentence within the guidelines, but "applied the guidelines erroneously;" (2) a sentence was imposed within the guidelines, "but the case involves circumstances where the application of the guidelines would be clearly unreasonable;" or (3) "the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable." 42 Pa.C.S. § 9781(c). The instant sentence is in the aggravated range of the guidelines and therefore must be affirmed unless the sentencing court's application of the guidelines was unreasonable. While reasonableness is not defined in the statute, it "commonly connotes a decision that is 'irrational' or 'not guided by sound judgment.'" *Commonwealth v. Walls*, 926 A.2d 957, 963 (Pa. 2007).

Appellant argues that his sentence was greater than necessary to protect the public, focused solely on retribution, and the court did not consider any mitigating factors. *See* Appellant's brief at 44-48. However, Appellant fails to establish that the instant sentence was unreasonable. Appellant has not identified the mitigating factors that the trial court failed to consider, and

the certified record demonstrates that the court validly relied on several factors in electing to impose a sentence above the guidelines, all of which followed the general principles outlined in § 9721(b).

In fashioning the judgment of sentence, the trial court started by listing all of the evidence that it considered in fashioning its sentence, which included testimony from every stage of the trial, the pre-sentence investigation report, a mental health evaluation, the testimony presented by Appellant's witnesses at sentencing, the sentencing guidelines, and the statutory factors that it was required to consider. N.T. Sentencing Hearing, 8/23/18, at 28. The court found highly relevant Appellant's allocution, which it felt demonstrated that Appellant did not appreciate the impact that his actions had on the victim. *Id*. at 28.

The court also stated that it considered all of the mitigating circumstances Appellant presented. *Id*. at 28. At sentencing, the court heard from Appellant's sister, mother, father, and godmother. *Id*. at 10-15. All of the witnesses testified that Appellant had a long history of mental health and drug issues that continuously needed to be addressed. *Id*. Additionally, trial counsel argued that the fact that Appellant had a zero prior record score, a lot of family support, a high school diploma, and was only twenty-five years old, should all be considered as persuasive mitigation evidence. *Id*. at 5-8. Therefore, our review confirms that the trial court considered Appellant's mitigating factors, and determined that they were entitled to little or no weight

under the circumstances. We have no license to reweigh the mitigating circumstances against the aforementioned factors. *Macias*, *supra* at 778.

Nor did the trial court fail to place on the record its reasons for imposing a sentence above the standard range of the guidelines. This court offered the following explanation for its decision:

> Before I impose sentence, [Appellant], I need to say something to you. The most distressing thing about this case to me is that you continue to not understand what you did was wrong. It is clear to me that you do not get it. She may have flirted with you. She may have led you on. She could have done any of those things. She was asleep. You do not get to have sex with a woman who is asleep. It's against the law.
>
> The other victim who came in and said she was asleep, had the same issue. And so it was clear to me that you understood from the first case that there's a problem with having sex with someone who is asleep, even if you have engaged in a prior sexual activity. And this isn't about what people think about on TV as rape, somebody dragging somebody in the alley, meeting some stranger -- that is not how most rapes happen. Most rapes happen just like we heard in this case. What you did was wrong, and you need to fully embrace and understand that. What you did was wrong. There are no excuses. There is no explanation. What you took from this woman can never be given back to her. Never. And I'm going to sentence you in a moment, and that may bring her some solace, but I guarantee you that she would rather go back the day before this happened than have you sit in jail. That doesn't give her life back. It may give her some sense of justice, but it doesn't give back what you took. You took something from her that she can never get back. And you need to accept that. That doesn't mean you're beyond rehabilitation. It doesn't mean you aren't the person your family so eloquently spoke about. You're both things. You're a great son. You're a loving brother. You're a talented artist. You're kind. You help homeless people. And you raped her. Most people are contradiction[s]. You are contradiction. You are all of those things. You are all of those things and a rapist. You need to understand what it is that drove you coming from a family like this to do what you did. Because I am concerned that when you are released -- and everybody

virtually gets out of jail -- that you may make the same mistake, because you lack insight into your behavior. You lack insight. You don't understand what you did wrong, and that's terrifying.

That being said, I'm going to give you a slightly aggregated [sic] sentence based on the mitigating factors that were presented here. You had both mitigation, but you also had some aggravation. So I am going to sentence you to a term of six to 12 years.

*Id*. at 28-31.

The record establishes that the trial court took into account the relevant factors and explained the reasons for its sentence. It was concerned that Appellant did not understand that the victim's level of interest in him while she was conscious was irrelevant to her ability to consent to him when unconscious. Thus, he remained a danger to the community. Further, it found that Appellant's actions had a severe impact on the victim who began to "physically waste away" as a result of the assault.[3] Trial Court Opinion, 3/5/19, at 27. Accordingly, the trial court acted well within its discretion when it sentenced Appellant above the guidelines.

Judgment of sentence affirmed.

---

[3] The victim testified at the sentencing hearing that she had been diagnosed with PTSD and suffers from severe panic attacks and social anxiety as a result. *See* Sentencing Hearing, 8/23/18, at 20. The victim also stated that she had lost forty pounds, stopped getting a menstrual cycle, and experienced hair loss as a result of the PTSD brought on by the assault. *Id*. at 21.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/30/20



**IN THE COURT OF COMMON PLEAS**
**FOR THE COUNTY OF PHILADELPHIA**
**CRIMINAL TRIAL DIVISION**

| | | |
|---|---|---|
| **COMMONWEALTH** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| **VS.** | : | |
| | : | |
| **IAN HYATT** | : | **NO. CP-51-CR-0002152-2017** |

**OPINION**

Lucretia Clemons, J.

Defendant Ian Hyatt appeals from his judgment of sentence entered on August 23, 2018, after a jury found the Defendant guilty of Rape of an Unconscious Victim under 18 Pa.C.S. § 3121 (a)(3), Sexual Assault under 18 Pa.C.S. § 3124.1, and Indecent Assault of an Unconscious Person under 18 Pa.C.S. § 3126 (a)(4). This Court imposed a sentence of six (6) to twelve (12) years of incarceration, with credit for time served and lifetime sex offense registration. On appeal, Defendant challenges the admission of prior bad act evidence pursuant to Pa. R. E. § 404(b), the sufficiency of the evidence, the weight of the evidence, and the aggravation of his sentence six (6) months above the standard sentencing guideline range. For the reasons discussed herein, this Court respectfully requests that the Superior Court affirm the jury's verdict and this Court's judgment of sentence.

1

## I.    FACTUAL HISTORY[1]

On February 21, 2017, K.U. had dinner and two or three cocktails with a friend. N.T. Trial 6/12, at 51-52. She returned home to 822 North Preston Street in West Philadelphia, where she had been living with the Defendant and three other house mates in a rooming house for two or three weeks. *Id.* at 49.[2] She went to her room to change into pajamas and take her prescribed insomnia medication, and then agreed to watch a movie with the Defendant in their communal living room. *Id.* at 51. She fell asleep on the living room couch soon after the movie began, briefly waking up once when a pizza arrived. *Id.* at 53.

Sometime later,[3] K.U. woke up on her living room couch to find that her pants and underwear were pulled down to the middle of her thighs, and the Defendant was positioned behind her, penetrating her vagina with his penis. *Id.* at 57. K.U. adamantly and credibly testified that she was unconscious when the Defendant began to engage in sexual intercourse with her, and that she did not consent to sexual intercourse or any other sexual activity with the Defendant at any time that evening. *Id.* at 60-61. She immediately said two things to the Defendant, in some order: "What the fuck," and "Are you wearing a condom?" *Id.* at 57.

---

[1] This Factual History is taken from the Notes of Testimony titled Prior Bad Acts, dated Friday January 26, 2018 (hereinafter "N.T. PBA Mot."); Trial (Jury) Volume I, dated June 11, 2018 (hereinafter "N.T. Trial 6/11"); Trial (Jury) Volume I, dated June 12, 2018 (hereinafter "N.T. Trial 6/12"); Trial (Jury) Volume I, dated June 13, 2018 (hereinafter "N.T. Trial 6/13"); Sentencing Volume I, dated August 23, 2018 (hereinafter "N.T. Sentencing").

[2] K.U. testified that on the night she was raped, she had lived in the rooming house for "about two weeks." N.T. Trial 6/12, at 48. This was consistent with Officer Seabron's Special Victims Officer Memorandum. *Id.* at 46. She subsequently testified, however, that she moved into the house at the "beginning of February," and that she had lived there for a few days before her house mates hosted a Super Bowl party. *Id.* at 64-65. In 2017, the Super Bowl occurred on February 5th. Therefore, K.U. was likely living there for closer to three weeks.

[3] K.U. testified that they started watching the movie soon after 11 p.m., and she called Women Organized Against Rape (hereinafter WOAR) at about 1:50 a.m. N.T. Trial 6/11, at 83.

2

She jumped from the couch, ran upstairs, and searched Google for "what to do if you get raped." *Id.* at 57-58. Based on her research, she contacted Women Organized Against Rape (hereinafter WOAR) and took an Uber to the Hospital of the University of Pennsylvania. *Id.* at 58-59, 84. There, she met with a WOAR representative and gave a urine sample, and a police officer arrived to transport her to the Special Victims Unit, where she received a rape examination. *Id.* at 58-59. The Defendant was arrested a few hours later. *See* Phila. Police Dep't Investigation Report, Cmmw. Ex. 1, at 3.

## II. PROCEDURAL HISTORY

On March 23, 2017, the Defendant was arraigned and pleaded not guilty to rape of an unconscious person, sexual assault, and indecent assault of an unconscious person.[4] On January 9, 2018, the Commonwealth filed a Motion in Limine, where it sought to introduce prior bad act evidence of the Defendant's arrest in 2016 for the alleged rape of another woman, S.H. The Defendant filed a brief opposing the Motion in Limine on January 24, 2018. On January 26, 2018, after hearing argument from both parties, this Court granted the Commonwealth's motion, allowing the Commonwealth to introduce evidence regarding the Defendant's prior arrest in its case-in-chief.[5]

---

[4] Before trial began, the Commonwealth nolle prossed a fourth charge for unlawful restraint causing serious bodily injury, pursuant to 18 Pa.C.S. § 2902(a)(1). *See* N.T. Trial 6/11, at 164-65.

[5] The Court heard the Commonwealth's second motion in limine on June 11, 2018, before trial began, and denied it because the evidence was more prejudicial than probative. There, the Commonwealth sought to introduce evidence of the Defendant's assault of multiple police officers approximately ten (10) to twelve (12) hours after he gave a statement to the Special Victims Unit and was arrested, as evidence of the history of the case, his consciousness of guilt, and his attempt to escape. The Court denied this motion as more prejudicial than probative, *see* N.T. Trial 6/11, at 16, but the Commonwealth was permitted to introduce this evidence at the Defendant's sentencing hearing. *See* pp. 25-26, *infra.*

3

On June 11, 2018, the Defendant proceeded to a Jury Trial. On that day, voir dire was completed and the Defendant was arraigned before the jury. Opening arguments began on June 12, 2018, and the trial concluded on June 13, 2018. In all, there were nine Commonwealth witnesses, including K.U. and S.H., and five defense witnesses, including the Defendant. The jury deliberated for less than three hours before determining that the Defendant was guilty of all three charges.

On August 23, 2018, this Court sentenced the Defendant. The parties agreed that the Defendant had a prior record score of zero (0) and that the offense gravity score for the lead conviction of Rape of an Unconscious Victim is twelve (12), which generates a standard sentencing guideline range of forty-eight to sixty-six months of incarceration, plus or minus up to twelve months (shorthanded as 48-66 ± 12). *See* N.T. Sentencing, at 5. Noting that it considered that both mitigating and aggravating factors influenced the Defendant's sentence, this Court then sentenced the Defendant to seventy-two (72) months to one hundred and forty-four (144) months of incarceration, *id.* at 31, which is an aggravated sentence six (6) months above the standard sentencing guidelines.

The Defendant promptly filed a Post-Sentence Motion on August 26, 2018, which raised the same four issues raised in this appeal. This Court denied the motion without a hearing on September 7, 2018. The Defendant then filed a timely Notice of Appeal on September 11, 2018. On September 12, 2018, this Court filed a filed an order pursuant to Pa. R. A. P. 1925(b), instructing the Defendant to file a statement of errors. On September 14, 2018, the Defendant filed a Statement Pursuant to Pa. R. A. P. § 1925(b). On or about December 13, 2018, this Court received the completed Notes of Testimony.

4

## III. THE DEFENDANT'S STATEMENT OF ERRORS

The Defendant raises four errors upon appeal:

1. The trial court erred in granting the Commonwealth of Pennsylvania's Motion to Admit a prior bad act involving defendant Ian Hyatt and another individual identified [as] S.H. under Pa. R. E. 404(b)[,] as the evidence was only offered to show a propensity on the part of the defendant to engage in nonconsensual intercourse with an unconscious person.

2. There was insufficient evidence presented warranting the verdict of guilty on the charges of rape of an unconscious person, sexual assault and indecent assault of a person unconscious[,] as the Commonwealth failed to demonstrate the complainant was unconscious at the time of the alleged offense or that the complainant was unaware the alleged conduct was occurring. The evidence was also not sufficient to show the complainant did not consent to have intercourse with the defendant.

3. The jury's verdict of guilty on the charges of rape of an unconscious person, sexual assault and indecent assault of a person unconscious was against the weight of the evidence[,] where the complainant's testimony was equivocal regarding the happening of the accident and defendant testified the parties had an on-going relationship and she consented to have sexual intercourse with him.

4. The trial court abused its discretion in sentencing Defendant[ ] Ian Hyatt to six to twelve years of incarceration[,] which was an aggravated sentence and beyond the top of the standard guideline range of sixty-six (66) months[,] and failed to explain the justification for an aggravated sentence.

Def.'s Statement Pursuant to Pa. R. A. P. 1925(b), at 1-2 (Hereinafter "Def. SOE").

## IV. DISCUSSION

For the reasons below, none of these alleged errors has merit.

### A. The Defendant's Prior Bad Act Was Admissible Pursuant to Pa. R. E. § 404(b).

The Defendant challenges this Court's admission of prior bad act evidence during his trial. Def. SOE, at 1. The Commonwealth argued that evidence of the Defendant's prior arrest for his alleged rape of S.H. while she was unconscious should be admissible in the Defendant's trial. The Commonwealth alleged that on April 30, 2016 – less than ten (10) months before the

5

Defendant's alleged rape of K.U. – S.H. smoked marijuana, drank beer, and took two Tylenol PM and fell asleep in the Defendant's bedroom. Cmmw.'s Mot. in Limine to Admit Other Acts/Crimes Evidence, at 2, Jan. 9, 2018 (hereinafter "Cmmw.'s PBA Mot."). Sometime after she fell asleep, she "woke up to the Defendant engaging in vaginal intercourse with her without her consent." Id.[6] S.H. told the police that the Defendant had made sexual advances that evening before she fell asleep and that she rejected him. Id.

Although "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," Pa. R. E. § 404(b)(1), the Court did not admit this evidence as general proof of the Defendant's bad character or his propensity to commit crimes. Instead, the Court admitted S.H.'s testimony for two permissible purposes: First, it corroborates the Defendant's common scheme to initiate sexual intercourse with women without their consent while they were unconscious. Second, the evidence could be introduced as rebuttal evidence, should the Defendant take the stand and open the door by claiming he did not rape anyone.[7]

---

[6] This was the information available to the Court at the time of the motion. At trial, however, S.H. testified to waking up *after* the Defendant had intercourse with her. N.T. Trial 6/13, at 41-43; *see also* Investigation Interview Record of S.H., Cmmw. Ex. 26, at 2. She knew this because there was semen on her butt and inside of her vagina. N.T. Trial 6/13, at 42. The Defendant was behind her on the bed in a spooning position. *Id.* Nevertheless, had the Court had the correct information at the time of this motion, it still would have made the same decision to admit S.H.'s testimony.

[7] The Court also considered the Commonwealth's argument that this evidence was admissible as proof of the Defendant's lack of mistake in this offense. Cmmw.'s PBA Mot., at 7. Initially, the Court believed that this was a permissible basis for introducing the bad act evidence—should the Defendant claim that he mistakenly believed that K.U. was awake, or that K.U. could consent to have sex with him while she was unconscious, then his prior arrest could have been introduced as evidence that his conduct was not likely a mistake, and that he was put on notice that it was illegal to have sex with an unconscious woman. *See* Com. v. Tyson, 119 A.3d 353, 362-63 (Pa. Super. 2015). At trial, however, the Defendant did not testify to making a "mistake"—instead, he claimed that K.U. was fully awake the entire time, and that she fabricated her unconsciousness. *See* N.T. Trial 6/13, at 81-84. Therefore, the prior bad act evidence was ultimately not admissible as lack of mistake evidence at trial.

1. **The Defendant's Prior Alleged Rape of an Unconscious Woman is Admissible as Evidence of a Common Plan.**

In ruling that the evidence of Defendant's encounter with S.H. should be admitted in this trial as evidence of a common plan, this Court applied a tripartite test: First, the Court "examine[d] the details and surrounding circumstances of each criminal incident to assure that the evidence reveals criminal conduct which is distinctive and so nearly identical as to become the signature of the same perpetrator." Com. v. Tyson, 119 A.3d 353, 358-59 (Pa. Super. 2015) (en banc) (quoting Com. v. G.D.M., Sr., 926 A.2d 984, 987 (Pa. Super. 2007)). Second, the Court considered whether the evidence was "too remote in time to be probative." *Id.* at 359. Third, the Court evaluated whether the "probative value of the evidence [was] outweighed by its potential prejudicial impact upon the trier of fact." *Id.*

First, the factual circumstances of the Defendant's alleged rapes of S.H. and K.U. were "distinctive and so nearly identical" that they constituted "the signature of the same perpetrator." *See id.* at 359. "Relevant to such a finding will be the habits or patterns of action or conduct undertaken by the perpetrator to commit crime, as well as the time, place, and types of victims typically chosen by the perpetrator." *Id.* For prior conduct to be admissible to reflect the defendant's "signature," it is not enough that they are crimes of the same general class. Com. v. Semenza, 127 A.3d 1, 7 (Pa. Super. 2015). Rather, other offenses are admissible as evidence of a defendant's common plan "where the crimes are so related that proof of one tends to prove the other[]." *Id.* (citing Com. v. Elliott, 549 Pa. 132, 145 (1997), *abrogated on other grounds by* Com. v. Freeman, 573 Pa. 532 (2003)).

Commonwealth v. Tyson is strikingly similar to this case. There, the Superior Court found that the trial court abused its discretion by denying the Commonwealth's motion to admit evidence of the defendant's prior rape of an unconscious woman in his trial for rape of a second

7

unconscious woman. Tyson, 119 A.3d at 357. The Superior Court found that the two rapes provided evidence of the defendant's common plan because both victims were black women in their twenties, both alleged rapes occurred in the early morning hours in the victims' bedrooms, the defendant was aware that both victims were in weakened or compromised states, and both victims awoke to find the defendant having vaginal intercourse with them. *Id.* at 360. Specifically, the Superior Court focused on the Defendant's common behavioral patterns:

> The factual overlap between the two incidents goes beyond the commission of crimes or conduct of the same general class. The evidence does not merely show Appellee sexually assaulted two different women or that Appellee's actions are generically common to many sexual assault cases. To the contrary, the incidents reflect a clear pattern where appellee was legitimately in each victim's home; Appellee was cognizant of each victim's compromised state; and Appellee had vaginal intercourse with each victim in her bedroom in the middle of the night while the victim was unconscious.

*Id.*

Here, the motion in limine record indicated that there were many similarities between the Defendant's alleged encounters with S.H. and K.U.: First, the Defendant had personal relationships with both women – he had a prior consensual sexual history with S.H.,[8] and he lived with K.U. Cmmw.'s PBA Mot., at 1-2, 6. Second, the Defendant allegedly raped each victim in his own home. *Id.* at 1-2. Third, both women allegedly fell asleep in the same room as the Defendant while voluntarily spending time alone with the Defendant. *Id.* Fourth, each woman allegedly woke up to find that the Defendant was engaging or had engaged in sexual intercourse with her without her consent. *See id.* at 1-2; *but see* n.6, *supra* (correcting factual inaccuracy). Fifth, each woman reported that she voluntarily took medications and/or intoxicating substances

---

[8] *See* Def. Resp. to Cmmw.'s PBA Mot., at 2, 6. K.U. testified that she repeatedly rejected his sexual advances, N.T. Trial 6/12, at 50, and S.H. testified that although she and the Defendant previously had consensual sexual oral sex, she did not consent to any sexual activity with him on the evening preceding her alleged rape. N.T. Trial 6/13, at 44.

8

before the assaults. *See* Cmmw.'s PBA Mot., at 1-2. Finally, and of lesser importance, the complainants were both women in their mid-twenties, although they were of different races. *See id.*; N.T. PBA Mot., at 3-4.

The Defendant attempted to differentiate the alleged facts of his encounters with S.H. and K.U., focusing on three distinctions: First, he had a prior sexual experience with S.H., whereas he had no prior sexual experiences with K.U.[9] *See* Def.'s Resp. to Cmmw.'s PBA Mot., at 2, 6. This distinction was immaterial, as the Commonwealth claimed that whatever the Defendant's prior sexual relationship was with S.H., she rejected his advances on that evening before she fell asleep. Second, the Defendant lived with K.U. and was watching television with her on the night of the alleged rape, whereas "S.H. was a visitor with whom he had prior relations" who was "with her friend and wandered into defendant's room of her own volition." *Id.* at 5-6. This distinction also made no difference – both S.H. and K.U. voluntarily spent time with the Defendant alone in *his* home.[10] Third, the Commonwealth charged the Defendant with different crimes: For the alleged rape of S.H., he was charged with rape by forcible compulsion; for the alleged rape of K.U., he was charged with rape of an unconscious victim. *Id.* at 5-6. It was clearly documented, however, that S.H. reported that she was unconscious, so this appeared to be an error in the information. *See, e.g.*, Investigation Interview R. of S.H., Cmmw. Ex. 26, at 2.

After considering all of the similarities and differences between S.H.'s allegations and K.U.'s allegations, and evaluating case law concerning the admissibility of prior sex offenses as

---

[9] Although this was a distinction made at the motion hearing, the Defendant focused on his romantic and sexual interest in K.U. at trial, and characterized their relationship as "friends with benefits." *See* discussion *infra* at p. 19.

[10] A similar distinction made no material difference in Tyson. There, the defendant wandered into the first victim's bedroom while he was at a friend's party, whereas the second victim invited him to her home to deliver food when she was ill. 119 A.3d at 356.

9

evidence of a common plan or scheme, the Court determined that S.H.'s and K.U.'s testimony, if found credible by the jury, reflect the same scheme: both women were acquainted with the Defendant and voluntarily spent time with him in his home, neither woman engaged in consensual sexual conduct with him on the nights in question, and the Defendant then waited until both women fell asleep to initiate sexual intercourse with them while they were unable to communicate their consent or refusal. This specific pattern of the Defendant's intentional behavior indicates that these acts were not merely criminal allegations of the same general class of sex crimes.

Second, the Court determined that the Defendant's alleged prior bad act was not too remote in time to be probative of his rape of K.U. When considering whether a prior bad act is too remote in time to be admissible for its probative value, "the importance of the time period is inversely proportional to the similarity of the crimes in question." Com. v. Aikens, 990 A.3d 1181, 1185 (Pa. Super. 2010). The Defendant allegedly raped S.H. on or about April 30, 2016. The Defendant raped K.U. on or about February 22, 2017. The gap in time between these offenses was a bit less than ten (10) months.[11] In sex offense cases where the Commonwealth seeks to introduce evidence of the defendant's prior sex offenses, several year gaps between similar sex offenses generally do not raise a remoteness issue. See, e.g., Com. v. Tyson, 119 A.3d at 357 (finding that five years between the end of the appellee's incarceration for the first rape and the second alleged rape was not too remote); Com. v. Aikens, 990 A.2d at 1186 (holding evidence of defendant's prior rape of his biological daughter ten years earlier was

---

[11] The gap was only eight (8) months from the end of the Defendant's pretrial incarceration for the alleged rape of S.H. on June 16, 2016 and his rape of K.U. See MC-51-CR-0012524-16, at p. 5.

10

admissible at trial for indecent contact with his other biological daughter, where the fact patterns in the two assaults were markedly similar).

Third, although S.H.'s testimony was undoubtedly prejudicial to the Defendant, its probative value outweighed this prejudicial impact. The Defendant testified that (1) K.U. fabricated her unconsciousness; she instead engaged in consensual sex with him and only became upset about five to ten minutes into sexual intercourse, when she realized that he was not wearing a condom; and that (2) he was sexually attracted to K.U. and cared about her as a person, so he had no desire to hurt her by raping her. *See* N.T. Trial 6/13, at 81-84, 86-87; *see also* discussion *infra* pp. 16-18. If the jury believed S.H.'s testimony to be credible, then her account was probative of two general facts: First, it was more likely that the Defendant engaged in a scheme of intentional conduct of targeting sleeping acquaintances, and less likely that K.U. fabricated the fact that she was unconscious. Second, if credible, S.H.'s testimony impeached the Defendant's claim that he wouldn't rape a woman that he was sexually attracted to, since S.H. and the Defendant both conceded that they had prior consensual sexual activity. Thus, S.H.'s testimony had considerable probative value, and that probative value far outweighed any prejudicial impact upon the Defendant. Because S.H.'s testimony is relevant to both K.U.'s credibility and the Defendant's theory of the case, the prior bad act evidence was more probative than prejudicial.

This Court also attempted to mitigate the prejudicial impact of the prior bad act evidence by providing a limiting instruction in its final jury instructions that explicitly informed the jury that S.H.'s testimony was before it "for a very limited purpose, that is, for the purpose of tending

11

to show the defendant's common plan, scheme and design," and that it could not be considered as indicating the Defendant's guilt or propensity to commit any crime. N.T. Trial 6/13, at 172.[12]

### 2. The Defendant's Prior Alleged Rape of an Unconscious Woman is Admissible As Rebuttal Evidence.

Even if this Court erred by allowing the Commonwealth to introduce this prior bad act evidence in its case-in-chief as evidence of the Defendant's common plan or scheme, this was a harmless error,[13] because the Defendant's testimony inevitably would have opened the door to the admission of S.H.'s testimony as rebuttal evidence.

Generally, "[a] litigant opens the door to inadmissible evidence by presenting proof that creates a false impression refuted by the otherwise prohibited evidence." Com. v. Murphy, 182 A.3d 1002, 1005 (Pa. Super. 2018). "Where the evidence proposed goes to the impeachment of the testimony of his opponent's witnesses, it is admissible as a matter of right. Rebuttal is proper where facts discrediting the proponent's witnesses have been offered." Com. v. Yocolano, 169

---

[12] This is the full instruction:

> You have heard evidence that the defendant was previously accused of an offense for which he is not on trial today. I'm speaking about the testimony to the effect that the defendant sexually assault[ed] and/or raped [S.H.]. The evidence is before you for a very limited purpose, that is, for the purpose of tending to show the defendant's common plan, scheme and design. This evidence must not be considered by you in any other way, other than the purpose I ha[ve] just stated. You must not regard this evidence as showing the defendant is a person of bad character or criminal tendencies from which you might be inclined to infer guilt.

N.T. Trial 6/13, at 172-73.

[13] Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

Com. v. Chmiel, 585 Pa. 547, 581-82 (2005) (internal citation omitted).

12

A.3d 47, 56 (Pa. Super. 2017) (quoting Com. v. Ballard, 622 Pa. 177, 212-13 (2013)). Defense counsel conceded during the motion in limine that should the Defendant take the stand and claim that he did not rape anyone, the prior bad act evidence would be admissible as rebuttal evidence. N.T. PBA Mot., at 6. The Court also noted that Defendant would not merely attack K.U.'s credibility, but he would specifically attack her credibility about her unconsciousness, which is a central issue to the case. *Id.* at 7-9. For this reason, the Court found the Commonwealth's argument persuasive that, should the Defendant argue that K.U. was conscious the entire time, S.H.'s testimony would be admissible as rebuttal evidence to impeach his credibility.

At trial, the Defendant testified that K.U. was fully conscious and eager to engage in consensual sexual activity with him, and that she only felt that he raped her when she discovered that he was not wearing a condom. *See infra* pp. 16-18. The Defendant also characterized himself as someone who would never intentionally do something like "wait until [K.U. fell] asleep and then penetrate [her]," particularly where he was sexually attracted to her and cared about her as a person. N.T. Trial 6/13 at 86-87. At these points, the Defendant opened the door to S.H.'s testimony, which tends to disprove the likelihood that K.U. would fabricate her unconsciousness and contradict the Defendant's characterization of himself as someone who would not do this to someone he is sexually attracted to. *Cf.* Com. v. Powers, 577 A.2d 194, 196-97 (Pa. Super. 1990) (holding rebuttal evidence admissible where defendant testified on cross-examination that he had never shown x-rated video tapes to *any* of his grandchildren, and where the rebuttal evidence was another grandchild's testimony that he showed her x-rated videos); Com. v. Conte, 198 A.3d 1169, 1179-80 (Pa. Super. 2018) (holding testimony of defendant's sexual contact with another

13

minor was admissible where it was offered to rebut defendant's testimony that he had "never been inappropriate" with his daughter (the complainant) or *any other child*).[14]

Therefore, because the prior bad act evidence would have been admissible to rebut the Defendant's testimony, any error in admitting this testimony during the Commonwealth's case-in-chief as evidence of the Defendant's common scheme was harmless error.

## B.     The Jury's Verdict Was Supported by Sufficient Evidence.

The Defendant next alleges that the jury convicted the Defendant of rape of an unconscious person,[15] sexual assault,[16] and indecent assault of an unconscious person[17] based upon insufficient evidence, "as the Commonwealth failed to demonstrate the complainant was unconscious at the time of the alleged offense or that the complainant was unaware the alleged conduct was occurring. The evidence was also not sufficient to show the complainant did not consent to have intercourse with the defendant." *See* Def. SOE, at 1-2. Defendant's claim must

---

[14] It is possible that the Commonwealth would have needed to ask a few questions of the Defendant to provide a legal basis for the rebuttal evidence. Notably, because S.H. testified before the Defendant did, defense counsel directly examined the Defendant about this issue, so the Commonwealth had no reason to repeat these questions in an attempt to open the door. *See, e.g.,* N.T. Trial 6/13, at 89.

[15] To convict a defendant of rape of an unconscious person, the jury must believe beyond a reasonable doubt that the defendant (1) engaged in sexual intercourse with the complainant; (2) the complainant was unconscious or unaware that the sexual intercourse was occurring; and (3) the defendant knew or recklessly disregarded the fact that the complainant was unconscious or unaware. *See* 18 Pa.C.S. § 3121(a)(4); Pa. Suggested Standard Crim. Jury Instruction § 15.3121B (4).

[16] To convict a defendant of sexual assault, the jury must believe beyond a reasonable doubt that the defendant (1) engaged in sexual intercourse with the complainant; (2) the complainant did not consent to the intercourse; and (3) the defendant acted knowingly or at least recklessly regarding the complainant's lack of consent. *See* 18 Pa.C.S. § 3124.1; Pa. Suggested Standard Crim. Jury Instruction §15.3124.1(1).

[17] To convict a defendant of indecent contact with an unconscious person, the jury must believe beyond a reasonable doubt that the defendant (1) had indecent contact with the complainant; (2) the complainant was unconscious or unaware that the contact was occurring at the time of the indecent contact; and (3) the defendant knew or recklessly disregarded the fact that the complainant was unconscious or unaware. *See* 18 Pa.C.S. § 3126(a)(4); Pa. Suggested Standard Crim. Jury Instruction §15.3126B(1).

fail, because K.U.'s testimony alone, if believed by the jury, provided sufficient evidence to convict the Defendant.

To evaluate the Defendant's challenge to the sufficiency of the evidence, this Court "must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found every element of the crime charged beyond a reasonable doubt." Com. v. Wall, 953 A.2d 581, 584 (Pa. Super. 2008). If the evidence supporting the verdict "is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law." Com. v. Widmer, 560 Pa. 308, 319 (2000). Importantly, in evaluating the sufficiency of the evidence, reviewing courts do not "assess the credibility or veracity of the evidence." Com. v. Price, 616 A.2d 681, 683 (Pa. Super. 1992).

It was undisputed at trial that the Defendant engaged in sexual intercourse with K.U. and that he did not explicitly ask K.U. whether she wanted to have sex with him or whether he could touch her sexually. See N.T. Trial 6/13, at 81-83. The Defendant claims that there was insufficient evidence of three elements: that K.U. was unconscious, that she was unaware that the intercourse was occurring, and that she did not consent to have sexual intercourse with the Defendant. The Defendant's allegations fail based on K.U.'s testimony alone. See Com. v. Gonzalez, 109 A.3d 711, 721 (Pa. Super. 2015) ("The victim's uncorroborated testimony is sufficient to support a rape conviction."). K.U.'s testimony was clear and unequivocal: she was asleep when the Defendant initially penetrated her, so she was unaware of the sexual contact until she woke up and refused it; she never at any point consented to have sex with the Defendant; and she did not want to have sex with the Defendant that evening. N.T. Trial 6/12, at

15

61. K.U.'s testimony provided the jury with sufficient evidence to find the Defendant guilty of rape of an unconscious person, sexual assault, and indecent contact of an unconscious person.[18]

## C. The Jury's Verdict Was Not Against the Weight of the Evidence.

The Defendant next alleges that the jury's guilty verdict was against the weight of the evidence, "where the complainant's testimony was equivocal regarding the happening of the accident and defendant testified [that] the parties had an on-going relationship and she consented to have sexual intercourse with him." Def. SOE, at 2.

When the trial court finds that the jury verdict was against the weight of the evidence, the court must believe that "the verdict was so contrary to the evidence as to shock one's sense of justice and make the award of a new trial imperative." Com. v. Wall, 953 A.2d 581, 586 (Pa. Super. 2008). A verdict shocks the judicial conscience "[w]hen the figure of Justice totters on her pedestal, or when the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench." Com. v. Davidson, 860 A.2d 575, 581 (Pa. Super. 2004) (internal quotations and citation omitted). "[T]he role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." Com. v. Widmer, 560 Pa. 308, 320 (2000).

The jury's verdict neither surprised this Court nor disturbed its conscience: After hearing the evidence, this Court, too, was persuaded beyond a reasonable doubt that the Defendant engaged in sexual intercourse with K.U. while she was unconscious and without her prior

---

[18] If the Defendant intends to argue that K.U.'s testimony was not credible, that argument is inappropriate for a review of the sufficiency of the evidence, because "a sufficiency challenge asks only whether evidence exists on the record that, if believed, would support a conviction for rape. We may not assess the credibility or veracity of the evidence." Com. v. Price, 616 A.2d 681, 683 (Pa. Super. 1992).

16

consent. K.U.'s trial testimony was credible and remained consistent with the information she relayed to several other Commonwealth witnesses who investigated her complaint. *See, e.g.,* N.T. Trial 6/12, at 39-42; Phila. Police Dept. Investigation Report, Cmmw. Ex. 1, at 1; Special Victims Unit Officer's Mem., Cmmw. Ex. 7; Aff. of Probable Cause, Cmmw. Ex. 16, at 2; Phila. Sexual Assault Response Ctr. Record, Cmmw. Ex. 23, at 10; HUP Emergency Dep't Record, Cmmw. Ex. 25, at 2.

The Defendant's testimony and other evidence did not cast doubt on K.U.'s testimony. The Defendant conceded that he initiated sexual activity with KU on the night in question. The Defendant testified that he was "aggressively" sexually touching K.U. while he was behind her on the couch, and she encouraged him to continue by "gyrating" against him and "moaning." N.T. Trial 6/13, at 81-82. The Defendant claimed that K.U. believed that she was raped only because he did not use a condom while they had consensual sex, describing her reaction after five to ten minutes of sexual intercourse, N.T. Trial 6/13, at 84, as follows:

> She had turned around [during intercourse] and asked me, 'Do you have a condom on?' And that's when I said no. And she then asked me, 'Did you come yet?' And I said no, not yet. And that's when she pulled me out of her and she got very upset.
>
> She was like, 'How could you do this to me? What are you doing?' . . . . And she said, '[Y]ou know, you just like'—she kind of had to think about [it]—'[Y]ou kind of just, like, raped me.'
>
> I was like, '[W]hat? Whoa. Hold on, hold on, hold on, hold on. [K.], I would never do that to you. You know, we been chilling for this long, like, why would I even—why would I even think of doing that to you.'

*Id.* at 83.

Aside from its self-serving nature, the Defendant's version of events was incredible in three key ways: First, although the Defendant initially testified that K.U. was only upset regarding his failure to use a condom and that K.U. made no mention of her unconsciousness, he

17

later implicitly admitted that he was aware before K.U. went to the hospital and filed a police report that K.U. claimed to be unconscious:

> Q. Did you talk to [K.U.] between the time that she went to her room and . . . before she left?
>
> A. She had come back downstairs and she had, you know, kept on asking me the same question.
>
> When she turned on the light and looked at me and I looked at her directly in her eyes and I said, [K.], I would never do this to you. You know, like we've been chilling for this long, and I'm not going to sit there and forcefully—or even do this intentionally. *Like, wait until you fall asleep and then penetrate you.* Like, it doesn't make no sense.

*Id.* at 85 (emphasis added). If, as the Defendant claimed, K.U. was fully conscious while they engaged in consensual sex, and if she only felt that she was raped because the Defendant failed to wear a condom, then he would have had no reason to "look her directly in her eyes" and assure her that he would "never . . . wait [for her to] fall asleep and then penetrate [her]." Second, the Defendant's description of his foreplay and K.U.'s fully-conscious responsiveness, if true, made it unlikely that K.U. would fail to notice whether her consensual sexual partner paused to put on a condom, particularly if she cared about his condom usage. Third, the Defendant's description of a consenting partner who initially encouraged his sexual overtures and then withdrew because she eventually felt that he "kind of" raped her is at odds with the uncontroverted evidence supporting K.U.'s immediate hue and cry – she made a 2 a.m. visit to the hospital, and none of the hospital records or police paperwork corroborates the Defendant's claim that K.U. was upset about his condom usage rather than the fact that she was sleeping and did not consent to have sex with him. *See* Cmmw. Exs. cited *supra* pp. 16-17. For these reasons, the Defendant's testimony did not shift the weight of the evidence supporting his conviction.

18

As a final consideration, the defense strategy at trial, during sentencing, and even in the phrasing of this error reflects a misguided preoccupation with K.U.'s alleged sexual or romantic interest in the Defendant. There was no material evidence that K.U. ever consented to engage in any overtly sexual activity with him. Despite the Defendant's vague testimony that they were "friends with benefits" and "maybe a little bit closer than friends." N.T. Trial 6/13, at 69, 70, 117-18, neither party testified to sexual physical contact beyond the Defendant giving K.U. one or two massages during the three weeks that they knew each other,[19] and no massage occurred on the evening in question. The Defendant called two witnesses—his father and his father's fiancée—to testify that they observed the Defendant and K.U. at a Super Bowl party and believed that the two appeared to have a flirtatious relationship, but this party was two weeks before this crime occurred. *See* N.T. Trial 6/12, at 209-10, 216-17. The Defendant provided a photograph from that party where he and K.U. are sitting together on a couch and his arm is around her shoulders.[20] Regardless of how the Defendant interpreted these background events, they do not shift the weight of the evidence: It is immaterial if K.U. expressed any romantic, sexual, or friendly interest in the Defendant in the two or three weeks before the rape. K.U. credibly testified that she was unconscious when the Defendant penetrated her and did not consent to have sex with him, and she had no discernible motive to fabricate that testimony.

---

[19] K.U. testified that the Defendant once gave her a back massage because she was sore from the gym, but she did not consider it to be sexual. N.T. Trial 6/12, at 50, 67-68. The Defendant claimed that he also gave her a foot massage while they watched TV about a week after she moved in. N.T. Trial 6/13, at 73-74.

[20] *See* Def. Ex. 2. K.U. testified that she was "clearly uncomfortable" in the photo, N.T. Trial 6/12, at 64, while the Defendant stated that she did not appear to be uncomfortable while that photograph was taken. N.T. Trial 6/13, at 70-71. Regardless of which version is accurate, the photograph provides no clear evidence of whether their relationships was more friendly or romantic in nature.

For all of these reasons, the weight of the evidence strongly supports the jury's conviction of all three crimes charged, and the Defendant offers no reason why this jury verdict should have shocked the Court's conscience.

### D. This Court Did Not Abuse Its Discretion by Aggravating the Defendant's Sentence Six Months Above the Standard Sentencing Guidelines Range.

Finally, the Defendant alleges that this Court abused its discretion because it aggravated the Defendant's sentence six (6) months above the standard guideline range,[21] "and failed to explain the justification for an aggravated sentence." Def. SOE, at 2. The Defendant's claim must fail because it does not raise a substantial question that warrants the Superior Court's review of the discretionary aspects of Defendant's sentence: Contrary to the Defendant's assertion, the sentencing transcript reflects that this Court provided ample explanation for this aggravated sentence. Even if the Defendant does raise a substantial question, however, this Court did not abuse its discretion in sentencing the Defendant to an aggravated sentence, where, after considering the entire trial record, several presentencing documents, and all evidence presented at the sentencing hearing, this Court made a reasoned determination that a slightly aggravated sentence was appropriate.

### 1. The Defendant Fails to Raise A Substantial Question that Merits the Superior Court's Review of a Discretionary Sentence.

Before it reaches the merits of a discretionary sentencing issue, the Superior Court applies a four-part threshold test to determine:

(1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify

---

[21] As stated above, this Court sentenced the Defendant to a minimum of seventy-two (72) months (or six (6) years) of incarceration. Both parties agreed at sentencing that the standard sentencing range for this type of crime and the Defendant's lack of any prior criminal convictions is forty-eight to sixty-six months of incarceration, plus or minus up to twelve months (shorthanded as 48-66 ± 12). *See* pp. 3-4, *infra*.

sentence; (3) whether appellant's brief has a fatal defect; and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

Com. v. Levy, 83 A.3d 457, 467 (Pa. Super. 2013) (quoting Com. v. Moury, 992 A.3d 162, 170 (Pa. Super. 2010)) (internal citations omitted). "A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." Com. v. Glass, 50 A.3d 720, 727 (Pa. Super. 2012) (citations and internal quotation marks omitted).

Here, a timely notice of appeal has been filed and the issue was preserved in a post-sentence motion.[22] The Defendant, however, failed to raise a substantial question in either his Post-Sentence Motion or his Statement of Errors, because this Court outlined all of the sources that it reviewed in determining the Defendant's sentence, acknowledged that it considered both aggravating and mitigating circumstances, and then elaborated at length on its primary reason for aggravating the sentence. The Court listed the materials it reviewed in determining its sentence as follows:

> the evidence introduced and the history, including during the pretrial hearing, the trial of this case, everything in the pre-sentencing report, the investigation of the prior record score, the mental health evaluation, which I have carefully reviewed; everything presented during the sentencing hearing, including all of the mitigating evidence presented on behalf of the defendant; the statement of the victim; the statements on behalf of the defendant; the sentencing guidelines and the statutory factors that I am required by law to consider, which include the need to protect the public, the gravity of the offense as it relates to the impact to the victim and the community, and the rehabilitative needs of the defendant.

N.T. Sentencing, at pp. 28-29. Cf. Com. v. Mawhinney, 915 A.2d 107, 110 (Pa. Super. 2006) (upholding trial court's discretionary sentence where the court heard from both counsel and the

---

[22] This Court did not examine any appellate briefing and cannot opine on whether there are any defects.

21

defendant himself and stated on the record that "it had considered the presentence report, the Sentencing Guidelines, and all of the trial testimony in fashioning the sentence," without further elaborating on why the sentence was appropriate).

After relaying the evidence it considered in crafting an appropriate sentence, the Court then clearly communicated its primary reason for aggravating the Defendant's sentence:

> The most distressing thing about this case to me is that you continue to not understand what you did wrong. It is clear to me that you don't get it. [K.U.] may have flirted with you. She may have led you on. She could have done any of those things. She was asleep. You do not get to have sex with a woman who is asleep. It's against the law. The other victim who came in and said she was asleep[] had the same issue. And so it was clear to me that you understood from the first case that there's a problem with having sex with someone who is asleep, even if you have engaged in prior sexual activity . . . . You need to understand what it is that drove you[,] coming from a family like this[,] to do what you did. Because I am concerned that when you are released . . . you may make the same mistake, because you lack insight into your behavior. You lack insight. You don't understand what you did wrong, and that's terrifying.

N.T. Sentencing, at 29-31. That the Defendant's lack of insight into his crime poses a danger to the community was certainly not the *only* factor that this Court considered in fashioning an appropriate sentence. Rather, it was the most straightforward explanation that this Court could provide to the Defendant as to why he did not receive a guideline sentence, and it was what the Court felt the Defendant most needed to understand in order to begin his rehabilitation. The Defendant is not entitled to the trial court's exhaustive discussion of every aggravating, mitigating, and other factor that it evaluated before arriving at its reasoned conclusion that his crime warranted an aggravated sentence.

For these reasons, the record does not corroborate the Defendant's bald assertion that this Court did not explain why it aggravated his sentence, and therefore, the Defendant fails to raise a substantial question that warrants review of the discretionary aspects of his sentence.

22

2. <u>In the Alternative, the Trial Court Appropriately Sentenced the Defendant Six Months Above the Standard Sentencing Guidelines.</u>

The Court also stated on the record that it evaluated other factors, both mitigating and aggravating, in ultimately fashioning an aggravated sentence. *See* N.T. Sentencing, at 31 ("I'm going to give you a slightly aggregated sentence based on the mitigating factors that were presented here. You had both mitigation . . . [and] some aggravation."). It did not specify all of these factors on the record. Should the Superior Court wish to reach the merits of the Defendant's discretionary sentencing claim, this Court will now address those other factors that it considered:

Initially, the Court identified two factors that could potentially mitigate the Defendant's sentence: First, the Court observed the Defendant's extensive familial support, and his older sister, mother, father, and godmother provided glowing character references for the Defendant and requested leniency.[23] Second, the Court considered the Defendant's history of mental health issues, including a prior diagnosis of Impulse Control Disorder. *See* Def.'s Presentence Investigation Report – Psychiatric Report, at 4. Those mental health issues have resulted in three involuntary commitments, where he did not follow up with outpatient treatment after his release. *Id.* Thus, the Court was willing to believe, without additional evidence, that these mental health issues were substantial and that the Defendant did not receive adequate treatment for those issues. The Defendant, however, failed to specify how his mental health issues caused him to

---

[23] These witnesses generally described him as a kind, smart, and artistic person who cares about people experiencing homelessness, people with disabilities, children, and animals. *See* N.T. Sentencing, at 10-16. His sister, Tracy Hyatt, testified that his family knew "for quite some time that he's had a lot of mental issues and [they have] been addressed multiple times throughout his life," and noted that the family is still working on addressing those issues. *Id.* at 11. His mother testified that he is not malicious, and that this crime is not like him. *Id.* at 13. His father, Vincent Hyatt, testified that he is a "gentle giant" who "doesn't deserve to be locked away," and that this crime was "a mistake, poor judgment." *Id.* at 14.

rape K.U. More importantly, he did not explain how he would address these mental health issues in the future to prevent himself from repeating what appears to be a pattern of initiating nonconsensual sex with unconscious women.[24] While this Court remains hopeful that the Defendant is capable of addressing these issues over time and eventually reentering society, his mental health history was fatally underdeveloped as mitigating evidence.

Next, the Court evaluated considerable aggravating evidence: First, as discussed above, the Defendant's inability to appreciate that what he did was illegal strongly indicates that he is currently a danger to society. Second, K.U. experienced significant trauma as a result of the Defendant's criminal actions.[25] Third, the Court did not believe that the Defendant was genuinely remorseful regarding the harm he caused K.U. or that he accepted responsibility for his own actions: Although his victim-blaming behavior during trial could have been a misguided strategy to discredit K.U.'s testimony,[26] even during his allocution, the Defendant continued to

---

[24] Counsel briefly referenced that the pre-sentence investigation "mention[ed] some mental health issues, [including] the fact that he had been 302'd on two separate occasions." N.T. Sentencing, at 8. Two of the character witnesses referenced the Defendant's mental health issues. *Id.* at 11, 15. The Defendant did not mention his mental health issues during his allocution. *See id.* at 25-28.

[25] K.U. was formally diagnosed with post-traumatic stress disorder (PTSD) after she was raped, and at the time of her sentencing testimony eighteen (18) months after the rape, she continued to suffer from many PTSD symptoms, including panic attacks, social anxiety, a desire to be alone, and a fear of men. N.T. Sentencing, at 20-21. Her other physical symptoms included extreme involuntary weight loss of about forty pounds, hair loss and graying, and the cessation of her menstrual cycle for nearly one year. *Id.* at 21. She also noted that she has not been able to tell her parents about the rape or trial because it "would destroy them," which was very isolating. *Id.* at 21. The Commonwealth further noted that K.U. ultimately had to move out of her new home due to the Defendant's assault, but she was trapped in that house for two months afterwards because she could not afford to move. *Id.* at 24.

[26] For example, when defense counsel asked whether the Defendant ever saw K.U. take her insomnia medication, he used the question as an opportunity to tell the jury that at some point, K.U. was a stripper. *See* N.T. Trial 6/13, at 77-78. Similarly, he also claimed that on the evening he was accused of raping S.H., he started touching her while she was sleeping, S.H. woke up and asked him what he was doing, the Defendant replied that he wanted to have sex, and then she told him "I need a check," implying that she wanted him to pay her to have sex with him. *Id.* at 96-97.

24

dwell on the "mixed signals" K.U. allegedly sent him.[27] The Defendant also stated that he was "sorry," but if he "really, really, really" wanted to rape K.U., he could have violently done so.[28] He also failed to acknowledge at any point in his allocution that he was accused of raping K.U. while she was unconscious. *See id.* at 25-28. Overall, the Defendant's allocution impressed the Court as a failure to accept what he was convicted of as "real" rape.

Finally, this Court heard evidence of two issues that it ultimately categorized as neither mitigating nor aggravating: First, the Defendant's professed marijuana use had no evidentiary value in calculating his sentence, as the Defendant forwarded no evidence that his drug use had any relevance to his actions. *See* N.T. Sentencing, at 9, 27. Second, this Court could not assign any aggravating or mitigating value to the video that the Commonwealth played during sentencing,[29] which showed the Defendant escaping his cell room at the Special Victims Unit after he gave a statement regarding his alleged rape of K.U., and then beating and disarming several law enforcement or corrections officers. The video was muted, but the Court knew from hearing the initial motion in limine for this evidence that while the Defendant did this, he

---

[27]      I told her that I would never do nothing to her like that . . . . I look at my case and I get so angry. Always just ask why? We could have talked about this, went about this a different way, but the little time that we did have together as friends, I really valued it. Because . . . we connected on a lot of levels . . . I felt as though, you know, i[t] could have been more than just a friendship. Other people don't see it that way. Mixed signals that I thought I was getting – you know, it just didn't register right.

N.T. Sentencing, at 26-27.

[28]      I do want to formally apologize to these [wo]men. I am very sorry. I never meant to hurt them. I didn't like force them to do anything. I am not like that type of person that's going to hold somebody down. You can see I am a big person. [K.U.] is half my size, if that. If I really, really, really was going to do something – do you understand what I am saying? I am not – I would never do nothing to hurt her . . . . I am not . . . some weirdo.

N.T Sentencing, at 26.

[29] See *supra* n.5.

25

repeatedly said "Kill me, just kill me." *See* Cmmw.'s Notice of Intent to Present Other Acts by Def. As Evidence of Consciousness of Guilt, at 2, June 6, 2018. Although the Commonwealth argued that this was an attempt to escape and an admission of guilt, the Court was unable to draw that conclusion, because the Defendant's actions were equally consistent with an attempt to commit suicide by police, particularly given the combination of his history of mental health issues with the stresses of criminal investigation and arrest. Moreover, the Court believed that this event was adequately addressed when the Defendant plead guilty to three counts of aggravated assault.[30] Accordingly, this post-arrest event neither aggravated nor mitigated the Defendant's sentence.

Ultimately, although familial support and the Defendant's mental health history were two generally mitigating factors, there was insufficient explanation for how that mitigating evidence either contributed to this particular offense or informed a concrete plan for his rehabilitation. This Court believes that this is not a "standard case" anticipated by the sentencing guidelines for a person without a prior criminal record who rapes an unconscious person, particularly due to the unique circumstances of the Defendant's prior arrest,[31] the impact that it has had and will always have on K.U.'s life, and the Defendant's current danger to society. First, the Defendant's prior arrest put him on notice that if he has sex with an unconscious woman, he has committed rape, so it is particularly troubling that he was arrested again for the same alleged behavior less than ten months later. Second, not all sexual assault victims experience the same types or degree of harm,

---

[30] *See* CP-51-CR-0004828-2017, CP-51-CR-0004858-2017, and CP-51-CR-0004859-2017.

[31] "[T]he fact that a defendant is guilty of prior criminal conduct for which he escaped prosecution has long been an acceptable sentencing consideration . . . when there is evidentiary proof linking the defendant to the conduct." Com. v. P.L.S., 894 A.2d 120, 130 (Pa. Super. 2006). Relatedly, "[i]t is not improper for a court to consider a defendant's prior arrests which did not result in conviction, as long as the court recognizes the defendant has not been convicted of the charges." *Id.* at 131 (citation omitted).

26

and in this particular case, the Defendant's actions caused K.U. to experience severe PTSD and physically waste away. Finally, and again, most importantly, the Defendant did not understand that K.U.'s level of interest in him while she was conscious was irrelevant to her ability to consent to him while she was unconscious. The Defendant's allocution about her mixed signals made it obvious to this Court that, even after two arrests for rape of unconscious women and one jury trial, there was no guarantee that the Defendant would not engage in similar behavior in the future.

For all of these reasons, this Court exercised its discretion in sentencing to aggravate the Defendant's sentence by six months. The Court did not fully aggravate the Defendant's sentence to the one year allotted by the sentencing guidelines, nor did it impose the Commonwealth's requested sentence of ten (10) to twenty (20) years of incarceration, because the Defendant's history of mental health issues and obvious familial support did provide some mitigation. Accordingly, this Court did not abuse its discretion by sentencing the Defendant to a slightly aggravated range of six to twelve years of incarceration.

## V.    CONCLUSION

For the above reasons, the trial court's judgment and sentence should be affirmed.

BY THE COURT:

LUCRETIA CLEMONS, J.
Dated: March 5, 2019

27

**Commonwealth v. Ian Hyatt**
**CP-51-CR-0002152-2017**

## PROOF OF SERVICE

I hereby certify that I am this day caused to be served the foregoing this person(s), and in the manner indicated below:

Attorney for the Commonwealth:

ATTN: Appeals Unit
District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107

Type of Service:    ( ) Personal    (X) First Class mail    ( ) CJC mailbox    ( ) Email

Attorney for Defendant:

Jonathan J. Sobel, Esquire
1500 Walnut Street, Ste. 2000
Philadelphia, PA 19102

Type of Service:    ( ) Personal    (X) First Class mail    ( ) CJC mailbox    ( ) Email

DATED: 3.5.19

Arlyn Katen, Esquire
Law Clerk to Hon. Lucretia Clemons

28